(Hamilton County Court of Common Pleas.)

THE BURNET WOODS BUILDING AND SAVINGS COMPANY, a Corporation under the Laws of Ohio, v. THE GERMAN NATIONAL BANK OF CINCINNATI, OHIO a Corporation under the Laws of the United States.

1. A banker is the debtor of his depositor, and engages to disburse his creditor's money only as directed by him. It follows that when once the order of the depositor, as contained in his written check, drawn as he intended to draw it, has passed beyond his control, and is issued for the purposes for which it was drawn, the banker can only discharge his duty to his depositor by strictly complying with the original terms of the check.

2. Therefore, the banker can pay on such check only the amount originally fixed therein, and to the person named therein as payee; or, if the check is drawn to the order of the payee, upon the payee's genuine endorsement.

3. So, too, if the payee is non-existent or fictitious, and a loss accrues through the failure of the banker to ascertain that fact, the loss falls on him.
These conclusions rest on principles of contract.

4. Exceptions, however, arise in cases where, through the act of the maker of the check, the contract between him and the banker has been vitiated, abrogated, or

waived; as where the fraud of the maker has intervened, or a special understanding exists between him and the banker, or he has expressly, impliedly, or on principles of estoppel, ratified the banker's act in paying the check; or where the fact of the non-existence or fictitious character of the payee was known to the maker.

5. A further exception, arising also out of the conduct of the maker, is found in that class of cases in which, through the negligence of the maker, a check is so inartificially and carelessly drawn, that before it is issued, an agent or employe of the maker changes it in essential particulars, or causes it to be drawn for his own dishonest purposes, to an a non-existent or fictitious payee, when the circumstances are such that the negligence of the maker is the proximate cause of the loss resulting from the payment of such check by the banker.

6. Such negligence, to constitute the proximate cause of the loss, can only be attributable to the maker with relation to his conduct in, or immediately connected with, the drawing of the check.

7. A depositor in a bank, in the drawing of a check, or in the conduct of that part of his business which is immediately connected with the drawing of a check, owes to his banker the duty of exercising ordinary care.
   This duty is founded on common rights and obligations, and is enforceable under the laws of torts.

8. A corporation, through its negligence in the management of its business, permitted its attorney and agent to cause to be inserted in a check drawn under such circumstances that it could only represent an actual transaction with a real person, a fictitious name as payee. The agent forged the ficitious name, added his own signature to the check, and drew the money thereon at the bank with which the corporation kept its account. *Held*, in an action by the corporation against the bank for the recovery of the amount called for by the check, that, while the depositor might recover from the bank for breach of contract, the bank could then recover from the depositor as upon a tort; and the court, to avoid circuity of action, would leave the parties where it found them and would award judgment for the defendant.

---

HOLLISTER, J.

The plaintiff, a depositor in defendant's bank, sues to recover $4,000, paid by the bank on checks drawn to a fictitious payee, whose non-existence was unknown to the plaintiff.

A jury being waived, the case was tried to the court when the following facts appeared:

The Burnet Woods Building & Savings Company was incorporated in 1890 under the laws of Ohio with a capital stock divided into 2,000 shares of $500 each. Among other things, its constitution provided that the members should assemble once every week for the payment of dues, assessments, etc. Books were required to be kept for recording all transactions which should, at all times, be open for inspection of members. Every person owning one or more shares of stock became a member, and was governed by the constitution and by-laws. Every member was required to purchase a pass-book in which the amounts of his payments on account of capital stock, the amount of interest and premium paid by him if a borrowing member, were credited to him, and must pay an initiation fee and 50 cents weekly per share as dues, until the dues and profits credited to him amounted to $500 per share. If a member desired to borrow in advance the amount of the shares of which he proposed to become the owner (a transaction called a purchase), it was provided that, "Section 5. The right of precedence in obtaining an advance shall be awarded to the member bidding the highest weekly premium per share. * * * The Board of Directors, however, reserve the right to reject any and all bids, if it be deemed necessary for the good of the company." "Section 7. Members who receive the face of their shares, or any portion thereof, shall secure the repayment of the same by the execution of mortgages to the satisfaction of the Board of Directors on real estate, a perpetual leasehold estate, or a leasehold with the privilege of purchase within a

fixed time at a fixed price; but loans shall not be made on leaseholds expiring in less than fifteen years. Such mortgage security shall be a first mortgage, and continue in force until the weekly dues at 50 cents per week per share and the earnings credited but not drawn, shall equal the sum of $500 per share * * * and until all installments of interest, fines, and assessments thereon shall have been paid, when the mortgage shall be cancelled * * *"

"Section 8. In the case of loans to owners of real estate, no advance shall be made for more than two-thirds of the appraised value."

Provision is made for distribution of earnings among the members, and there were many rules and regulations, by-laws, and constitutional provisions looking to the management of the company and the rights and liabilities of members, among which may be noted a part of section 1, article 13 of the constitution: "The business of the company shall be governed by a board of fifteen directors, to be elected annnually * *·*." Stringent rules were laid down governing the manner of voting for directors, and fines were imposed on all officers failing to attend the weekly meetings, the requirements on officers failing to transmit books of the company in their possession to the meetings being especially severe, and forfeiture of office was the constitutional penalty paid by any officer or director who should absent himself, without sufficient excuse, from three consecutive regular meetings. The duties of the directors were prescribed by article 17. "Section 1. The directors shall, in conjunction with the other officers of the company, form a board of administration, which shall be called the Board of Directors. It shall be the duty of the same to assemble every Friday evening, according to article 1 of this constitution, and assist the finance committee in receiving all payments of the members while the secretary registers the same. They shall further attend to all matters demanded in the interests and behalf of the company, and make effort to place the funds of the company in the most secure and profitable manner." "Section 2. It shall be the duty of the Board of Directors to appoint or discharge such agents as it deems proper * * *."

"Section 3. The Board of Directors shall have power to transact all general business of the company * * *."

"Section 4. The members have the right to be present at the meetings of the directors, and have the privilege of asking for information or making suggestions for the good of the company, and to investigate the proceedings."

It was the duty of the president to preside at all meetings, to sign, with the secretary, all checks, which must be countersigned by the treasurer, and to appoint an appraising, auditing, and other committees. It was, among other things, the duty of the treasurer to receive all moneys paid to the company, countersign all checks drawn by the president and secretary, and deposit all moneys in the name of the corporation in a bank designated by the board. The act of May 1, 1891, 88 O. L. 469, sec. 4, provides that, "Such funds can then be withdrawn only by check signed by the president and financial secretary, or such other officers as the board of directors may designate. The treasurer's bank book shall be open to the inspection of any director at any time. No president or secretary or other officer shall sign any check unless the expenditure has been authorized by the Board of Directors * * *."

The defendant was a banking corporation organized under the laws of the United States, and was the depository of plaintiff's moneys, chosen by plaintiff's directors.

The constitution imposed on the secretary the duty of keeping the

minutes of all meetings, and accurate accounts with all members. He was required to inform the company at every meeting how much money had been received and how much paid out, and was the custodian of the mortgages, bonds, and securities of the company. He was required to present every six months all of his books and papers to a committee of investigation, and the board at all times had the right to examine the securities held by him, and to direct how and where they should be kept.

The duties of the attorney were laid down in article XXI, as follows: "The attorney shall be appointed by the board of directors, and is an agent of the company. He shall answer the questions of law provided by the board, shall examine and report upon the title of property offered as security for loans, and shall certify in writing that no incumbrance has been filed in the recorder's office between the time of his report and the filing of the mortgage by the president. His compensation shall be fixed by the board, and for the examination of titles, he shall be paid by the borrower."

It was the duty also of the president to appoint from the board an appraising committee, an auditing committee, and a finance committee. Three directors comprised the appraising committee whose duty it was, "to visit the premises and ascertain the cash value of all real estate offered as security, and report the same in writing to the board" for which each member received a small compensation which however, he should forfeit unless he personally visit with the others the premises to be appraised. This committee was also the auditing committee of the board of directors.

The finance committee was composed of three members of the board, and it was their especial duty to "receipt all pass-books, and perform such other duties in connection therewith as the board might require. The pass-book was a small blank book especially prepared for the convenient entry of the various amounts received each week, and showing the account to which the payments, whether of dues, interest, or premium, were to be credited, together with a blank space for the receipt of a member of the finance committee. It contained also a certificate signed by the secretary, showing that the individual named in it was entitled to shares in the company.

The auditing committee, consisting of five non-office-holding members elected by the share-holders, were "required to audit the books and accounts of the company, and report in writing to the company." There were many other provisions in the constitution not necessary to be shown.

In the matter of making loans on real estate security, the course of business at the meetings of the directors was for the applicant, or some member of the board, or for the attorney, at that point in the meetings when money was offered for sale, to bid on behalf of the proposed borrower, for the precedence of drawing in advance the value of the number of shares desired, and the amount of premium per share for such advance as the borrower was willing to pay. Thereupon the money was awarded to the highest bidder, whose name was given either by himself, if he bid in person, or by the individual who conducted the bidding for him. The officers made it a part of their duty to bring borrowers into the company, and by so doing, to keep the money paid in by the members loaned out as it accumulated. After the bid was awarded, the bidder, or his representative doing the bidding, gave to the secretary a description of the property to be mortgaged by such bidder as security for the amount advanced. The appraising committee then, at their convenience, made it a practice to go personally to the property, look at it, and make inquiries from the owners of the property in the vicinity of that offered as security, and re-

port in writing signed by all of the committee in a book kept for the purpose.

The next step was for the bidder, or person bidding for him, to produce his deed for the property, or such description of it as would enable the attorney to easily identify it on the records in the recorder's office.

The attorney then examined the title of record, and reported his opinion thereon to the board in writing. If that was satisfactory, and the amount of money desired was not more than two-thirds of the appraised value of the property, the board then voted whether or not to loan the money on that security. That question being determined in the affirmative, the attorney was directed to prepare the mortgage, and the borrower, if he personally was present was directed to go to the attorney's office to execute the mortgage, or the individual who was transacting the business for him, was directed to notify the borrower to attend at the attorney's office for that purpose. It was the custom of this company at this stage of the proceedings for the mortgage after execution to be turned over to the president, whose duty it was to take it to the recorder's office to be recorded, and to call for it after it was recorded, and hand it to the secretary for safe keeping; but the president who was a clerk in defendant's bank and busily employed, usually gave the mortgage to the attorney to be by him delivered to the recorder. The dues, premium and interest were paid by the borrower in person, or by some one for him, usually a director. It will be seen that neither the constitution nor the course of business of the plaintiff, throughout all of the steps preliminary to granting a loan required the actual attendance of the member who borrowed money, or brought in contact with him any officer or representative of the company, excepting the attorney. There was no person or committee to report on the existence or the financial standing of the individual applying for the loan, or to ascertain the probability of his repaying in the weekly installments the money advanced to him.

The attorney was Herman Schrader who had served for about two years before September, 1892, and whose reputation for integrity was good. On August 19, 1892, he applied to the company at a regular meeting for eight shares, $4000, and bid for them six cents premium a share per week, saying that he wanted it for Caroline Beckler, a woman living in Clermont county, and a client of his, and the board sold the money to him for her. He then told the appraising committee where the property was, by which the loan was to be secured, saying that it belonged to the Hartman estate, of which the owners were Mrs. Hartman and her widowed daughter, Caroline Beckler. He exhibited no deed or other document containing a description of the property, although it is in evidence that he had some sort of paper in his hand. Shortly afterwards two of that committee went together to the place indicated, and inquired concerning the ownership of one Scheuer, who had a saloon on the Carthage pike, adjoining whose place Schrader had said the property lay. Scheuer told them that the property they described belonged to the Hartman estate, and that an old lady and her widowed daughter came out occasionally to look at it. They also inquired concerning values of land in the neighborhood from two individuals owning property in the vicinity. The third member of the committee went alone to see the property as described by Schrader, and fixed its location and value substantially as the others had done. At the next meeting of the company the appraisers agreed on a valuation per front foot, the aggregate value of the land being more than $6000. At that meeting Schrader was requested by them to write the description in the appraisement book which consisted of blank forms to be filled up with pertinent descriptions of all real esate offered as security. The re-

port of the committee was filed, and it appearing that the appraisement was at such a figure that under the two-thirds requirement the $4000 could be loaned, Schrader was directed to examine the title to the property.

At the regular meeting on September 2, 1892, Schrader filed his report on the title in the following manner.

"Cincinnati, Ohio, September 2, 1892.

To the Hon. Board of Directors of the Burnet Woods Building and Loaning Co.

Gentlemen:—I beg leave to report that I have examined title to lots No. 29, 30 and part of lot No. 31, in section 15, township 3, Range 2, Millcreek township, Hamilton county, Ohio, and find the same to be the property of Caroline Beckler and Anna Hartman and that there are no mortgages or other liens on record against said premises, so that the title to the same is clear, free and unencumbered.

Respectfully submitted,

HERMAN SCHRADER, Attorney."

Thereupon Schrader produced a paper purporting to be a mortgage, and handed it in the presence of the board to the president who returned it to Schrader with the request that he take it to the recorder's office for recording. The president says that he glanced at the signatures on the paper, but made no examination of it. It was not handed to any other member of the board, and no one asked to see it. It was not subjected to any scrutiny whatever. The defendant was the depository designated by the directors in compliance with the legal requirement, and on it a check was drawn by the proper officers in the following form:

"The Burnet Woods Building and Saving Co.

No. 375.            Cincinnati, September 2, 1892.

Pay to the order of Caroline Beckler , $2000, two thousand dollars.

Chas. Schad, President.
Herman Leiser, Secretary.
G. Kluesener, Treasurer.

To German National Bank, Cincinnati, O."

The check was handed to Schrader to be delivered by him to the payee on account of the $4000 loaned to her.

Schrader took the check, indorsed on its back the words, "Caroline Beckler," and under that signature he placed his own. He presented the check at the counter of the bank to the paying teller, and was by him paid in cash the amount called for. A similar check was drawn September 30th, and in the same manner Schrader obtained $2000 more.

Schrader was well known at the bank, had been a depositor there for several years, and was a depositor at the time of this transaction. Neither the bank nor the building association had any reason to question his integrity, and he had the confidence of both. Relying on Schrader and having reason to believe that the check represented a *bona fide* transaction, the bank paid to him the money without any inquiry of him or of any one as to the identity of Caroline Beckler, or of the genuineness of her signature.

The bank charged against the account of the Building Association the $4000 as drawn, and the account was balanced September 17, 1892, after

the first $2000 was drawn, and on the 26th of the following November, and the plaintiff's checks including the two described, were returned to the plaintiff, and again the bank-book was delivered to the plaintiff and the account was balanced January 14th 1893, the plaintiff making no objection to the payment of the checks at any time prior to January 14th 1893.

A deposit book was issued September 2, 1892, in the name of Caroline Beckler, with a certificate therein signed by the secretary of the Building association to the effect that Caroline Beckler was entitled to eight shares in the plaintiff company. The weekly dues, interest and premium were paid by Schrader at eight different dates beginning September 2, 1892, and ending December 2, following.

The treasurer examined the checks returned by the bank, saw Schrader's name on the two checks, and knew thereby that he had drawn the money. The semi-annual committee of audit also, in a report to the directors dated October 12, 1892, and made October 14, set forth that they had carefully examined the books of the association and had found everything correct. The checks were also exhibited to this committee. Schrader's name on the Beckler checks made no impression on the minds of the examiners in either instance.

The treasurer was a musician, had had little business experience, did not know Schrader's hand writing, and was even unable to say how many directors the association had. He says that he examined every check and every signature, and turned each check over to see if the name of the payee was on the back, and that the Beckler checks were the only checks on which Schrader's name appeared.

On or about January 1, 1893, Schrader disappeared, and on the 13th, his friends, alarmed at his absence, went to his office, broke open his desk, and found therein several letters, among which was one directed to the defendant's president. This was delivered, and the bank at once sent a copy to the plaintiff. Whereupon the latter demanded of the bank the payment of the $4000, or a credit of that amount on its books. This the bank declined to do.

Inquiries were immediately instituted by the plaintiff's agents to ascertain the identity of Caroline Beckler, and after making all efforts reasonably required were satisfied of her non-existence, and brought this action. They were justified in their conclusion.

The method adopted in the several steps leading up to the delivery of the checks was not unusual. On the contrary, what was done was in the method in which the plaintiff did its business. It was the usual course, and the transaction described is illustrative of every case where the plaintiff loaned money, beginning with the initial negotiation for it, and ending in the making and delivering of the check.

It is claimed by the defendant that the plaintiff was negligent in the transaction of its business.

The appraising committee, where it took the description from Schrader, practically abandoned their functions to him. Their visiting the property was an empty form. Each officer as the transaction in its successive steps came before him, blindly performed his part without inquiry or suspicion. When the mortgage was handed to the president, any examination at all would have disclosed a striking similarity in the hand writing in all parts of the instrument, and would have provoked comment from an ordinarily intelligent person. Indeed, it is difficult to understand how the president could have glanced at the signatures without observing how the letters composing them were in most instances exactly the same as the same letters in that part of the instrument immediately preceding

the signatures.    The general appearance of the writing, the inclination of the characters, and the relative distance of all of the writing above the printed lines, are so marked that a prudent man would have been put upon inquiry.

The requirement by the plaintiff of the presence of the borrowing member at any stage of the proceeding would have prevented the perpetration of the fraud.    The duty of bringing the member into contact with the association was assumed by Schrader.    As the agent of the plaintiff he assumed the duty of bringing about the personal relation without which a *bona fide* transaction could not have been completed.    He alone was given the power as the representative of the company of bringing in the one element without which no transaction of the kind could be *bona fide*, and that element was the existence of an actual person as borrower.    The whole trnsaction of a loan involved successive steps, each to be taken by distinct officers and agents of the association, and the supervision and superintendence of the fact that the member was in existence and did in fact sign the mortgage, and did in fact receive the check, was a duty devolving upon the corporation.    It is no answer to say that it was not necessary for the mortgage to have been executed in the presence of Schrader or any other agent, or that a check might have been delivered to the person entitled to it by any one to whom it was given for the purpose; for in such cases, or either of them, the fact would remain that there was no agency adopted by the association through which, the personal attendance of the member not being required, the existence of the borrower could be made sure.

Nor can the want of scrutiny of the mortgage be justified on the ground that to it was attached Schrader's notarial certificate, for his duties as notary were entirely distinct from the duties which his agency devolved upon him. Coming from him, the officer's, declaration that the mortgagors had acknowledged their signatures before him, was no more effective, and carried no greater weight than his statement that Caroline Beckler desired to become a member and to borrow money.

No supervision of any kind was exercised by the association over his acts as agent.

Numerous checks and safe-guards were thrown about other steps in such transactions; the committee were in sets of three; actual observation of the property was required; the securities, books, checks and bank-books were subjected to careful investigation by committees of audit and by the treasurer, and yet no supervision or investigation was required by the constitution or exercised or made by practice of the one fact on which all of the other proceedings were dependent.

Schrader assumed to act and was permitted to act both as agent for the company, and as attorney for his pretended client, a circumstance which should have induced a jealous supervision of his acts.

I cannot but find that the association conducted its business and its transactions carelessly and negligently.    Whether or not the defendant can avail itself of plaintiff's negligence is the question for decision in this case.

LAW—The plaintiff for recovery relies upon the obligations and duties of a banker to his customer as they exist by the law-merchant. The banker has the depositor's money which he engages to repay to him or to his order. To the amount of money in his hands belonging to the customer, the banker is the debtor of his customer, and his responsibility in paying out such money is measured by the character cf the authority given him by the customer.    That authority is contained in the form and substance of the paper delivered to the banker, and he must comply with its terms. Says the New York Court of Appeals in Crawford v. West Side Bank, 100

New York, 50, per Ruger, C. J. "The relation existing between a bank and its depositor is, in a strict sense, that of debtor and creditor, but in discharging its obligations as a debtor, the bank must do so subject to the rules obtaining between principal and agent." "In disbursing the customer's funds, it can pay them only in the usual course of business, and in conformity with his directions. In debiting his account, it is not entitled to charge any payment except those made at the time when, to the preson whom, and for the amount authorized by him." On the banker, in carrying out the instructions contained in a check or bill, is devolved the duty of ascertaining, when making payments, all of the facts which he must know to comply with the instructions as given. The paper as drawn by the maker is his authority to pay, and when the authority is followed in terms, it becomes his voucher for its payment. And it follows that if he pays in any other way, or to any other person than is directed, or if the paper as originally drawn has been changed after leaving the maker's hands it is not his authority or instruction, and he cannot be made chargeable upon it for the bank's failure to comply with the authority given.

On this theory the banker cannot charge to his depositor the amount of the checks to which the name of the payee has been forged. Welsh v. German American Bank, 73 N. Y. 424. The same rule applies to bills. Robarts v. Tucker, 16 Q. B. 560. The Supreme Court of Ohio in Dodge v. The National Exchange Bank, 20 Ohio St. 234, lays down with great precision the rules applicable to forged indorsements. "The duty of a banker is to pay the checks and bills of his customers drawn payable to order, to the person who becomes the holder by a genuine indorsement, and he cannot charge him with payments made otherwise, unless the circumstances amount to a direction from the customer to the banker to pay the paper without reference to the genuineness of its indorsement, or are equivalent to a subsequent admission that the indorsement is genuine, in reliance on which the banker is induced to alter his position."

"When there is no fraud, or special understanding between the banker and his customer, the liability of the banker for paying a check upon a forged indorsement, cannot be affected by conduct of the customer in drawing the check, of which the banker had no notice." The facts in this case will be referred to hereinafter. The decision was founded on Robarts v. Tucker, 16 Q. B. 560, and a part of the syllabus of that case was adopted as an appropriate syllabus. In that case a part of the syllabus reads: "A banker cannot debit his customer with the payment made to one who claims through a forged indorsement, and so cannot give a valid discharge for the bill, unless there be circumstances amounting to a direction from the customer to the banker to pay the bill without reference to the genuineness of the endorsement, or equivalent to an admission of its genuineness inducing the banker to alter his position, so as to conclude the customer from showing it to be forged."

In Crawford v. West Side Bank, *supra*, it appeared that Crawford, expecting to be away from his place of business, drew a check on the bank dated April 22, payable to his clerk, and left it in the clerk's charge with directions to draw the money on that day in case he did not return before noon, and to deliver the money to his foreman for payment to his employes. The clerk altered the date to the 21st, and on that day drew the money and absconded. It was held that the bank had no authority to pay. The court say: "It, (the bank) receives the depositor's funds upon the implied condition of disbursing them according to his order, and upon an accounting is liable for all such sums deposited, as it has paid away without receiving valid direction therefor. The bank is from necessity

responsible for any omission to discover the original terms and conditions of a check, once properly drawn upon it, because at the time of payment, it is the only party interested in protecting its integrity, who has the opportunity of inspection, and it therefore owes the duty to its depositors of guarding the fund intrusted to it, from spoliation. This liability arises although an alteration of a material part of his order has been effected, even though it be done so skillfully as to be difficult of detection by examination. This follows from the fact that after it is put in circulation, it passes beyond the reach of its maker, who has no opportunity until after it has fulfilled its office, if inspecting it, and protecting himself from loss occasioned by a fraudulent alteration. This opportunity a banker has, and he is responsible for any lack of vigilance in detecting the alteration *after it has once been correctly drawn*, with its blanks properly filled up, and is put in circulation by the maker.''

The rule of the banker's liability for payment of bills and checks fraudulently altered after they have left the drawer's hands, is subject, however, to the important exception that where the instrument has been so carelessly drawn as to afford the opportunity for such alterations, the drawer or acceptor shall stand the loss. The authorities on this subject are all founded on the case of Young v. Grote, 4 Bing. 253. In that case the drawer had signed blank checks, and left them with his wife to fill up. She filled them up in such a manner that the holder was enabled to add to the amount, and it was held that the bankers who had paid the larger amount, might charge their customer with it. The reason for the decision has been variously announced in several subsequent cases. Best, C. J. who delivered the opinion in the case, said: ''We decide here on the ground that the banker has been misled by want of proper caution on the part of his customer.'' The case was referred to in Robarts v. Tucker, where in 16, Q. B. 560, Baron Parke is reported to have said: ''This was in truth considering that the customer had by signing a blank cheque given authority to any person in whose hands it was to fill up the cheque in whatever way the blank permitted.'' The report of that case in 15 Jur. 988, attributes to him the words: ''But in that case there was negligence in the drawing of the cheque itself, which was authority given by the drawers to the bank.'' In 20 L. J. (N. S.) Q. B. 273, he is reported to have said: ''There the court held that the cheque was drawn in so negligent a way as to facilitate the forgery and to exonerate the banker from liaiblity to his customer for paying the amount. They, in trust, consider that he, as it were, gave authority to the party to fill up the cheque in the way it was filled up.'' Gray, C. J. in Greenfield Savings Bank v. Stowell, 123 Mass. 196 is of opinion that the report as contained in the Law Journal, *supra*, is in accordance wth latter statements of Baron Parke, of Lord Cranworth, and of Chief Justice Erle, ''which put the decision in Young v. Grote upon the ground that the customer's negligence in the transaction had afforded opportunity for the fraud of his clerk, by which the bank was deceived.'' Bank of Ireland v. Evans Charities, 5 H. L. Cas. 389; British Linen Co. v. Caledonia Ins. Co. 4 Macq. 107, 114; Orr v. Union Bank of Scotland, 1 Macq. 513, 523; Ex parte Swan, 7 C. B. (N. S.) 400, 431, 433. Chief Justice Gray then goes on to cite and adopt the opinion entertained by Chief Justice Cockburn as reported in Swan v. North British Australasian Co. 2. H. &. C. 175. ''The case of Young v. Grote, on which so much reliance has been placed, and which is supposed to have established this doctrine of estoppel by reason of negligence, when it comes to be more closely examined, turns out to have been decided without reference to estoppel at all. Neither the counsel in arguing that case, nor the judges in deciding it, refer once to the doctrine of estoppel.

The question arose on a disputed item in an account between a banker and his customer. * * * It was held not that the customer was estopped from denying that the check was a forgery, but that as the loss, which would otherwise fall on the banker, who had paid on a bad check, had been brought about by the negligence of the customer, the latter must sustain the loss. * * * I am disposed to think that technically looked at, the matter would stand thus: The customer would be entitled to recover from the banker the amount paid on such a check, the banker having no voucher to justify the payment. The banker on the other hand, would be entitled to recover against the customer for the loss sustained through the negligence of the latter. Possibly, to prevent circuity of action, the right of the banker to immunity in respect of the loss so brought about would afford him a defense in an action by the customer to recover the amount." The ground taken of Chief Justice Cockburn was adopted by the court of Exchequer in Halifax Union v. Wheelwright, L. R. 10 Ex. 183, 192, a case in which a clerk was authorized to fill up drafts, and altered them after they were drawn. The Court of Exchequer was of opinion that the view taken by Chief Justice Cockburn was correct. In that case, Cleasby, B. remarked, "But these various reasons for the conclusion only show how incontrovertible the conclusion itself is, and it is, perhaps, only an application of one of those general principles which do not belong to the municipal law of any particlar country, but which we cannot help giving effect to in the administration of justice, viz: that a man cannot take advantage of his own wrong—a man cannot complain of the consequences of his own default against a person who was misled by that default, without any fault of his own."

And Young v. Grote has had the approval of the Ohio Supreme Court. In Ellis & Morton v. Ohio Life and Trust Co., 4 Ohio St. 628, the court through no less an authority than Judge Ranney, say: "As a general proposition, it is perfectly well settled that payment upon a forged check or order cannot be charged by the person paying, against the party purporting to have drawn the paper, but the latter will be entitled to recover the money intrusted to the former, however innocently or with whatever caution the payment may have been made." Citing Hall v. Fuller, 5 B. & C. 750; Johnson v. Windel, 3 Bing. (N. C.) 225; Robarts v. Tucker, 12 Q. B. 560.

"But yet, in Young v. Grote, 4 Bing. 253, where the customer had intrusted his wife to fill up checks in his absence, and this had been so inartificially and carelessly done, as to be easily changed from £50 to £350, the banker was held entitled to a credit for the larger sum. In the very recent case of Orr v. Union Bank of Scotland, in the House of Lords, 29 Eng. Law & Eq. 1, Lord Chancellor Cranworth, in speaking of the general rule and the exception ingrafted upon it in this case, says 'the decision went on the ground that it was the fault of the customer, that the bank had been deceived. The principle is a sound one, that when the customer's neglect of due caution has caused his bankers to make a payment on a forged order, he shall not set up against them the invalidity of a document which he has induced them to act on as genuine."

We may then regard the law as positively settled that there are circumstancse under which the banker is excused from determining the question whether or not the paper presented to him for payment and drawn by his customer, contains the real authority which the maker intended it should when it left his hands.

Eminent judges may differ as to the ground on which the exception is based, yet they all agree that the customer has, by his negligence in drawing the check deceived the banker.

The doctrine of Young v. Grote was sought to be applied in the two important cases of Bank of Ireland v. Evans' Charities, 5 House of Lords, Cas. 389, and the Mayor, etc. of the Staple of England v. Bank of England, 21 Q. B. D. 160. In the former, trustees of an incorporated society, having a common seal, possessed stock in the public funds registered in the bank. Their secretary was permitted to have the custody of the seal. Five powers of attorney, to which the seal was affixed by the unauthorized act of the secretary, were presented to the bank, the stock transferred and the secretary received its proceeds. The trustees executed regular powers to another, who demanded of the bank a transfer. The bank refused. In the action brought by the trustees, the trial judge held that if the jury found under the circumstances that its trustees in permitting the secretary to have the seal, had so negligently conducted themselves, as to contribute to its loss, the verdict must be given for the bank. The House of Lords, Baron Parke delivering the unanimous opinion of the judges, held that the direction was wrong, and that such negligence only could preclude the trustees from maintaining their action, as was committed in, or was immediately connected with the transfer itself. Say the court: "Such was the case of Young v. Grote, on which great reliance was placed in the argument at your Lordship's bar. In that case it was held to have been the fault of the drawer of the cheque, that he misled the banker  *  *  * by want of proper caution in the mode of drawing the check, which admitted of easy interpolation, and consequently, that the drawer, having thus caused the banker to pay the forged check by his own neglect in the mode of drawing the check itself, could not complain of that payment. The present case is entirely different. If there was negligence in the custody of the seal, it was very remotely connected with the act of transfer. The transfer was not the necessary or ordinary or likely result of that negligence.  *  *  * It is clear, we think, that the negligence in the present case, if there be any, is much too remote to affect the transfer itself, and to cause the trustees to be parties to misleading the bank in making the transfer on the forged power of attorney." The Lord Chancellor, Cranworth, thought: "That there must be either something that amounts to an estoppel, or something that amounts to a ratification, in order to make the negligence a good answer. Now the case of Young v. Grote went upon that ground (whether correctly arrived at in point of fact is immaterial), that the plaintiff there was estopped from saying that he did not sign the check for £350; and if the circumstances are such, whether arising from negligence, or from any other cause, that as between the customer and his banker, the customer is estopped from saying that he did not sign the check for a particular amount, that as between them, is just the same as if he had signed it. Therefore taking that view of the facts, the case may be well sustained, and appears to have been well decided." In the case of the Mayor, etc., of the Staple of England v. Bank of England, the plaintiffs left their seal in the custody of their clerk, who, without authority, sealed powers of attorney, under which stock in the public funds belonging to plaintiff was sold. The clerk appropriated the proceeds. The plaintiff was an ancient corporate body, the reasons for the existence of which had long ceased; the clerk drew their dividends, which were expended in dinners, and kept the seal. Day and Wills, JJ., could not distinguish this case, from Young v. Grote, but on the authority of Bank v. Evans' Charities, left themselves bound to find for the plaintiffs. Lord Esher, M. R., endeavors to state what conclusion the House of Lords in Bank v. Evans' Charities, had come to relative to Young v. Grote, and finds that the negligence of the drawer was the proximate cause of

the injury. It may then be regarded as settled that the rule which re-quires the banker to pay over to the person named in the check or the one deriving title through such person's genuine indorsement, at the time and in the amount directed by the drawer, is subject to the qualification that he is excused from that requirement when he is deceived into the payment of a fraudulent check through the negligence of the drawer in, or immediately connected with, the drawing of the check. This conclusion brings us to the consideration of the meaning of the court as expressed in a part of the syllabus in the case of Dodge v. National Exchange Bank. The second subdivision of the syllabus reads: "When there is no fraud or special understanding between the banker and his customer, the liability of the banker for paying the check upon a forged indorsement, cannot be affected by conduct of the customer in drawing the check, of which the banker had no notice."

In that case Dodge, a creditor of the National Government, held its certificate of indebtedness, which he indorsed and sent in a letter to the United States paymaster at Cincinnati, a short time prior to January 22nd, 1866. The letter was stolen from the mail, and the certificate was presented to the paymaster at Cincinnati, who refused to pay it, not knowing the identity of the person presenting it. On the 22nd of January, the thief presented the certificate to Stryker, the paymaster at Columbus, who required him to identify himself as Dodge. On the representation by the thief that he could be identified at the bank, Stryker drew a check payable to the order of Dodge, and retired the certificate. The bank paid the check to the holder, who had forged Dodge's indorsement. The bank was held liable on the authority of Robarts v. Tucker, cited above.

Now it cannot for a moment be supposed that the learned Judges who decided that case were ignorant of the conclusion reached in Young v. Grote, or of its approval by eminent English authority; or that they had not before them the clear approval of that case by the Supreme Court in Ellis & Morton v. Ohio Life and Trust Co. Young v. Grote is not mentioned in the opinion. The syllabus, if allowed to stand as an announcement of a very important rule of law, is in direct contravention of the rule in that case. The conclusion is inevitable that the judges intended, as they ought, that the rule as announced should apply to the facts which were presented in the case before them. That the syllabus, however broad in assertion of principle, should be limited in its application to the facts in the case decided, has eminent authority. In Chamberlain v. Cleveland, 34 Ohio St. 551, at page 571, Judge Okey remarks; "I concur in the conclusion reached in this case, and, generally, in what is stated in the opinion of the chief justice. I do not concur, however, in all that is stated in the syllabus." He then states the language to which he objects and says; "This was not called for by anything in the record; and, even under our rule, such proposition does not become law by being placed in a syllabus." The rule to which he refers is found on page V, in the 5th Ohio State Reports, and is as follows: "Rule VI. Points decided. A syllabus of the points decided by the court in each case, shall be stated, in writing, by the judge assigned to deliver the opinion of the court, which shall be confined to the points of law, arising from the facts of the case, that had been determined by the court. And the syllabus shall be submitted to the judges concurring therein, for revisal, before publication thereof; and it shall be inserted in the book of reports without alteration, unless by the consent of the judges concurring therein."

Now in Dodge v. Bank, it was claimed that the negligence of Stryker arose in not requiring the person to whom the check was given to identify himself as Dodge, the owner of the certificate. Say the court, page 248;

On this branch of the case we are not unanimous.    But it seems to a majority of the court that as it was competent for the drawer to make his check payable to the order of Dodge, and devolve the duty on the bank of paying only on Dodge's genuine order, the liability of the bank cannot be affected or discharged by any act or omission of the drawer in issuing the check, of which the bank had no notice, and which in no way influenced its conduct.    This principle is distinctly recognized in Robarts v. Tucker, supra.

In that case it was the custom of an insurance company, located at London, to accept drafts in payment of losses in the country, drawn on it by its country agent payable to those entitled to receive the proceeds. The drafts were payable at Robarts' bank in London, with which the insurance company kept its account.    A loss occurred at Manchester, the agent there drew on the company in favor of the executors of the deceased, the draft was compared with the order to draw, and accepted, and sent to the agent, who delivered it to the payees' solicitor.    The solicitor forged the names of his clients, cashed the draft at a country bank which sent it to J. & L., bankers in London, its correspondent.    J. & L. presented the draft at maturity to Robarts, who paid it.    The insurance company paid the amount of the policy to those entitled to it, and sued Robarts for the sum paid.    It was held that Robarts having paid on a forged indorsement, was liable to its depositor, the insurance company, and that the principle on which Young v. Grote was decided did not apply.    The case of Dodge v. Bank was reviewed by the Supreme court in Dodge v. National Exchange Bank, 30 Ohio St. 1, on a question of evidence.    When the case was retried below after the decision in 20 Ohio St. it appeared that before the payment of the check, a clerk of the drawer happened to be in the bank, and said that the person presenting the check had received it from the paymaster, and it also appeared that before payment, the bank required identification, and thereupon the holder went out of the bank and returned with a clerk in a neighboring store who identified the holder as Dodge whom he had known in a hospital in the south during the war.    It was held that these additional facts did not change the case.    It will be noticed that the real controversy was not between the drawer and drawee; but that Dodge himself brought the suit against the bank on the theory that "the paymaster, by drawing and delivering the check in question, in payment of plaintiff's voucher, set apart and appropriated for the plaintiff's use so much of his funds as would be necessary for its payment.    This act of appropriation the plaintiff conclusively ratified by bringing this action. The defendant also assented to this appropriation, by accepting his check, by assuming to pay it and by claiming and receiving credit from the drawer for its payment.    By the act of acceptance, the defendant became bound to pay to the plaintiff, on his order, the sum named in his check; and for the breach of this obligation and implied promise, the plaintiff has a clear right of action."    It was considered by a majority of the court against the vigorous dissent of Judge Welch, that Dodge had the right to adopt the act of the thief in presenting the check as an agency whereby the bank must set apart for him the amount of the check payable to his order.    Over this question the main struggle in the case proceeded. It was claimed by the bank that the paymaster was liable to Dodge for negligence in not requiring the person presenting the check to identify himself as Dodge.    Say the court on page 6:  "Suppose this to be true, and that the plaintiff was not bound to regard the delivery of the check to a stranger having no authority to receive it, as a payment of his voucher; yet this was a question between the plaintiff and the paymaster only, with which the bank had no concern.    What right had the bank to complain that the paymaster was derelict in a duty which he owed to Dodge?"

It must be plain to one carefully considering the reasoning in these cases that the real effort of the court was directed, not toward absolutely fixing the rights, duties and obligations in all cases existing between customer and banker, but to work out the rights of a third person in no way responsible for an injury in which the drawer and the drawee of a check innocently participated.

It may well be doubted whether the paymaster was negligent at all. It is within common experience that checks are made payable to persons unknown in fact to the drawer. Merchants are constantly remitting payments by check to creditors known only in name, and have the right to suppose that bankers will pay only as they ought by the law-merchant. Now it does not seem to seriously alter the situation, that the possession of the check is intrusted to one who has all of the indicia of right to receive it. The check was payable to the person who alone could give a good discharge of it, and as between the drawer and drawee, the rights of the former could not be lost by a forgery of the real payee's name, and the court might well decide that Dodge could not be prejudiced by the failure of the bank to ascertain the genuiness of his signature; but it is not fair to say that the Supreme Court, if the case had been between the paymaster and the bank, and it were shown that the paymaster was guilty of actual, positive and affirmative negligence in and connected with the drawing of the check itself, would have disregarded the clear exception established by Young v. Grote, and have said that even under such circumstances "the liability of the banker for paying a check upon a forged indorsement, cannot be affected by conduct of customer in drawing a check, of which the banker had no notice." Such a case was not before the court.

Bearing in mind Baron Parke's comment in Robarts v. Tucker on the case of Young v. Grote, that it was in truth as if the drawer had given authority to the holder to fill up the check as he saw fit, and that the duty of the banker is to pay to the person named by the drawer, as well as the amount set forth in the check, the conclusion is irresistible that if the drawer by negligence permits a check to be drawn to whomsoever a dishonest clerk may designate, under such circumstances that the drawer ought to know whether the transaction is *bona fide* or not it is as if he gave authority to such person to fill in such name for the payee as he might choose. This was exactly what Schrader did. The duties of the officers were performed in an entirely perfunctory way. No effort was made to ascertain the one fact necessary to a *bona fide* transaction. No method in the course of the plaintiff's business, was adopted to determine the essential fact of the borrowing member's existence, excepting the voluntary performance of that duty by whomsoever might assume to perform it. When the president, secretary and treasurer solemnly drew up the check, they were but the unconscious instruments by which Schrader worked out his fraud. They acted in fact for the association in drawing the check, they were the association in that act, but in filling in the payee's name they did not act for the association, for it had provided no certain means of inserting the real name, and by that omission had given Schrader the opportunity of inserting through the officers any name he might see fit. The insertion of the name "Caroline Beckler" was therefore Schrader's act, and not the association's; and if the bank was misled as to the amount in one case, they were as much misled in this case as to the person. Its liability should be determined accordingly, as it seems to me.

The case might well stop here, but there are other authorities which must be considered and distinguished if possible. We have been dealing

with cases wherein the parties to the paper are real persons, while in the case at the bar the payee is non-existent, or a "fictitious person."

The case of Armstrong v. National Bank, 46 Ohio St. 512, at first reading, would seem conclusive against the defendant in this case. There one Grimes represented to Mrs. Armstrong that he was the agent of Brown whose note he offered to her for sale. Mrs. Armstrong purchased the note; gave her check to Grimes payable to the order of Brown. Grimes endorsed the name of Brown on the back of the check, endorsed his own name, presented the check at the bank in which Mrs. Armstrong was a depositor, and got the money. The note was fictitious, and Brown was non-existent. It was held that the case was, in its general features, analogous to the Dodge case, and should be ruled by it. The following syllabus was adopted:

" 1.   The rule that a negotiable instrument, made payable to a fictitious person or order, is, in effect, an instrument payable to bearer, applies only where it was so made with the knowledge of the party making it, and does not apply where the maker, supposing the payee to be a real person and intending payment to be made to such person or his order, is induced by the fraud of another to so draw it." This conclusion was justified by the cases cited in its support: Tatlock v. Harris, 3 T. R. 174, 180; Vere v. Lewis, Id. 182; Minet v. Gibson, Id. 481; Gibson v. Minet, 1 H. Bl. 569; Collis v. Emett, 1 H. Bl. 313; Gibson v. Hunter, 2 H. Bl. 187; Forbes v. Espy, 21 Ohio St. 483, an others.

"2.   Where by the fraud of a third person, a depositor of a bank is induced to draw his check payable tc a non-existing person, or order, the drawer being in ignorance of the fact and intending no fraud, the bank on which the check is so drawn, is not authorized to pay it and charge the amount to the account of its customer, on the indorsement of the party presenting it, alhough it appears to have been previously indorsed by the party named as payee. Such indorsement is, in effect, a forgery, and the payment thereon by the bank, confers no right on it as against the drawer of the check.

"3.   In the absence of a course of dealing or understanding to the contrary, between the parties, the duty of a banker is, in all cases to pay to the person named, or his order, where the terms of the check are such; and he may, and should withhold payment until fully satisfied as to the genuineness of the indorsement." None of the authorities cited in support of the rule that the knowledge of the drawer of the fiction will excuse the bank from its liability, show negligence on the part of the drawer, and Armstrong v. Bank was entirely free from that element.

The fourth finding of fact is in these words:

"5.   That she was not careless or negligent respecting the transaction, but instead was ordinarily careful and prudent in respect thereof."

We are, then, again confronted with a case where the syllabus and parts of the opinion announce as absolute, rules of law which very well cover the facts in the case under consideration, but, if regarded as unyielding, would be decisive of cases to which courts have applied principles not applicable to that case at all. So when the court say that, "It is the duty of the banker in all cases to pay to the person named, or his order, where the terms of the check are such," we must consider that the court were dealing with the facts in the case before it, and were not intending to overrule a well settled principle of law theretofore recognized in a previous case in the same court, and universally regarded as establishing an exception to the general rule of the liabilities of bankers to their customers.

So far, it seems to me, the case at the bar may be easily distin-

guished from Armstrong v. Bank, but the situation is further compli-
cated by a reference by Minshall J., in the last sentence of the opin-
ion in that case; "The case of Vagliano Brothers v. The Bank of England,
recently decided in England by the Court of Appeal, 23 .Q B. D. 243, and
called to my attention since the above opinion was written, fully supports
the conclusion we have reached." In that case Vagliano Bros., merchants
in London, with whom Vucina of Odessa had dealt for over thirty years,
were in the habit of accepting his drafts for large amounts. Glyka, Vag-
liano's clerk, occupying an insignificant position, prepared a number of
fictitious drafts on Vagliano, purporting to have been drawn by Vucina to
the order of Petridi & Co., of Constantinople. He also forged letters pur-
porting to be written by Vucina advising Vagliano of his intention to
draw. Glyka handed the fictitious drafts with other genuine drafts, to
Vagliano, who accepted them, and placed them in a box in which drafts
after acceptance were placed to be distributed to those entitled to them.
Glyka stole the fictitious drafts, presented them at the counter of the
bank, after forging Petridi's name, and got their proceeds in cash. He
thus secured some £71,500. There was evidence tending to show that it
was unusual for the bank to pay such large sums over the counter. Vag-
liano sued to recover the amounts paid out by the bank on these accept-
ances. Charles, J. to whom the case was tried, held that the negligence of
plaintiffs, if there was any, was not immediately connected with the
transaction itself, basing his opinion on Bank of Ireland v. Evans'
Charities, and Swan v. North British Australasian Co., *supra*. The bank
also claimed the protection of the bills of exchange act, 1882, 45 and 46
Vict. c 61, s 7, sub, s 3, which enacts with reference to bills of exchange,
that "where the payee is a fictitious or non-existing person, the bill may
be treated as payable to bearer." Petridi & Co. were in fact existent per-
sons, but had nothing to do with and were ignorant of the transaction,
nor was Vucina indebted to them. The trial judge held that they were
not fictitious or non-existing payees within the meaning of the act.

The case went to the Court of Appeal 23 Q. B. D., 243, and as there
decided was cited in Armstrong v. Bank. The entire court, Cotton, Lind-
ley, Brown, Fry, Lopes and Lord Esher, Master of the Rolls, held that,
"the plaintiff had not been guilty of negligence immediately connected
with the transaction so as to disentitle him to recover, and the entire
court, excepting Lord Esher, took the same view of the construction of
the bills of exchange act, as did Charles, J. below.

The opinion of a majority of the court was written by Bowen, L. J.
who among other things says: "On the question of negligence we agree with
Charles, J. There was no evidence of negligence on the part of the plain-
tiff which so directly caused the frauds in question in this action as to
prevent the plaintiff from succeeding in his claim. There was, we think,
negligence on his part in leaving so much to a clerk in Glyka's position
without any effective supervision or control over his proceedings. But
this was not the proximate cause of the loss which had been incurred,
and therefore cannot be relied on as a defense against the claim of the
plaintiff, even if there were no negligence on the part of the bank. But
the officers of the bank paid the bills across the counter, and it was
proven that the usual course of business was for a banker not to pay bills
of so large an amount except through a banker, and the officials neglected
this precaution, and paid the bills over the counter to a man whom they
did not know. This in our opinion was negligence on the part of the bank,
which materially contributed to the fraud in question being successfully
carried out. This, we think, would prevent the bank from effectually re-
lying on the defense of negligence of the plaintiff." Now, it is quite clear

that if the negligence of the plaintiff had been the proximate cause of the bank's payment, the conclusion on that branch of the cause would have been favorable to the bank unless the bank's negligence in paying large sums across the counter in the way it did would have prevented a decision in its favor. The decision of the Vagliano case, the question of negligence of the plaintiff as the proximate cause being eliminated, does support Armstrong v. Bank; but with that question open, it does not support the sweeping rules of law stated in the syllabus of the Armstrong case.

And the point I am endeavoring to make clear is further emphasized by the remarks of the Master of the Rolls at the end of his opinion at page 255 of the Vagliano case in the Court of Appeal; "As to the case of negligence relied upon by the bank, I think it right to say that I can see but one act of negligence on the part of plaintiff in his business. I think there was not a due supervision of the clerk. But I think that negligence was too remote from the loss suffered by the bank to enable the bank to rely on it. I think there was want of care in the bank in paying so many and such bills across the counter, as it is called; but I give no opinion whether such want of care would have disabled them from charging the plaintiff, if his negligence had been a proximate cause of the bank's loss."

Now if the element of negligence had been present in the Armstrong case, negligence in the drawing of the check itself, or in the proceedings connected with the drawing of the check, it cannot be doubted but that the court would have discussed that question as affecting the plaintiff's right to recover. If they had discussed that question the decision of the Court of Appeal in the Vagliano case would also have supported the conclusion that where the negligence of the plaintiff is the proximate cause of the loss, the bank may defend on that ground. In such case there would have been no promulgation of rigid and unexceptional rules; but a material qualification of the rule so as to cover cases where plaintiff's negligence barred his recovery.

But the Vagliano case was taken to the House of Lords, Appeal Cases, 1891, 107, and received the most careful consideration of the eminent judges. The decisions below were reversed first, on the ground that although Petridi & Co. were an existing firm in fact, yet as to the transactions in question, they were fictitious, and by Lords Halsbury, Watson and Macnaghten, and by the Earl of Selbourne, for reasons turning on the conduct of the parties. Contra, Lords Bramwell and Field and on the question of the conduct of the parties Lord Herschell said page 156; "I do not desire to be understood as dissenting from the view entertained by some of your Lordships, that, apart from the provisions of the statute, the facts of the present case afford sufficient grounds for arriving at the same decision." Lord Morris expressed no opinion on this point So, out of eight judges of the court of last resort of England, four think that even the facts in the Vagliano case, showed sufficient negligence on the part of the plaintiff to prevent his recovery; only two took the view of the Court of Appeal; one gives no opinion, and one considers it important to announce that he at least does not dissent from the views of the majority. No better words for expressing the reasons of the learned judges in arriving at their conclusion can be framed than the language adopted by them, and brief extracts may appropriately be cited.

Says Lord Halsbury, at page 105: "It seems to me impossible to dispute that this was, in fact, a misleading of the bankers. I pass by for the moment the question whose default it was, for the purpose of considering the proposition which has found favor with one of your Lordships, and which I will not dispute, that the carelessness of the customer, or neglect of the customer to take precautions, unconnected with the act it-

self, cannot be put forward by the banker as justifying his own default. In order to make the cases of the Bank of Ireland v. Evans' Charities and The Mayor, etc., of Merchants of the Staple of England v. Bank of England, authorities in this case, it would be necessary to assume that the plaintiffs in those cases had by some voluntary act of their own given credit and the appearance of genuineness to the particular powers of attorney which were forged in those cases, and if they had, I very much doubt whether the decision would have been what it was; but no such fact appeared; all the parties whose negligence was relied on had done, was to leave their seal carelessly in the custody of the person who abused his trust. These decisions do not seem to me to touch the case. But how can it be said in this case that the default is unconnected with the act? The very thing that the banker does is induced by the fault of the customer. Was not the customer bound to know whether there was any real transaction between himself and Vucina, effected by the instrument in question? There were other pertinent inquiries put by his lordship, and he went on to say: "The bankers paid upon these documents, and they paid a person who was not entitled to receive the money. There was no person entitled to receive it. The fact that it reached their hands as representing a mercantile transaction in which somebody was to be paid was itself a misleading of them; and that it did reach their hands purporting to represent such a transaction arose from the mode in which Mr. Vagliano's business was conducted by those responsible for it."

The Earl of Selbourne at page 123 says: "If the plaintiffs misled the bank upon a material point, however innocently, and although they were themselves deceived by the fraud which had been committed, I think that they, and not the bank, ought to bear the loss which has been the consequence." "It is not as I understand, disputed that there might, as between banker and customer, be circumstances which would be an answer to the *prima facie* case that its authority was only to pay to the order of the person named as payee upon the bill, and that the banker can only charge the customer with payments made pursuant to that authority. Negligence on the customer's part might be one of those circumstances; the fact that there was no real payee might be another; and I think that a representation made directly to the banker by the customer upon a material point, untrue in fact, (though believed by the person who made it to be true), and on which the banker acted by paying money which he would not have otherwise paid, ought also to be an answer to that *prima facie* case. If the bank acted upon such a representation in good faith, and according to the ordinary course of business, and a loss has in consequence occurred which would not have happened if the representation had been true, I think that is a loss which the customer, and not the bank ought to bear". And at page 126 he says: "And I am not convinced that estoppel is a sufficient explanation of the cases in which the drawer of a cheque has been held bound by fraudulent alterations for which the state of the paper afforded space. The drawer was ignorant of, and could hardly be held bound to anticipate, the subsequent fraud. But if it were universally true that the liability of an acceptor to a *bona fide* holder of a bill in all such cases depends upon legal estoppel, I do not think it would follow that the discharge of a banker or other agent employed by the acceptor to pay the bill must depend under similar circumtances upon that principle only."

We recognize here at least two distinct references by the learned judge to the facts in Young v. Grote. It is apparent that he repudiates the doctrine of estoppel as applicable to such cases. He adds further that: "The case of Robarts v. Tucker is no doubt law; but I am not for ex-

tending it as it seems to me to be extended by the order under appeal."
Says Lord Watson at page 134: "Throughout these transactions the bank
acted in good faith as the agent of Vagliano Brothers, and the errors into
which they were betrayed were mainly if not wholly attributable to their
having treated its bills as genuine, in reliance upon the representations
of their principals, which were untrue.    I think that in these circum-
stances Vagliano Brothers cannot be permitted to cast upon the bank
liability for errors arising from their own representations.    These repre-
sentations were no doubt made in the honest belief that they were true;
but that circumstance cannot, in my opinion, avail Vagliano Brothers in
the present question with their agent."

And this significant remark is found in the dissenting opinion of
Lord Bramwell at page 136; "I think the result of the authorities, Robarts
v. Tucker, Young v. Grote, Bank of Ireland v. Evans' Charities, Mayor,
etc, of the Merchants of England v. Bank of England, is, that the con-
duct of the bank's customer to enable the bank to charge the customer
must be conduct directly causing payment."    Then even in the view of a
dissenting judge the circumstances in Young v. Grote involved such con-
duct on the part of the customer as directly caused the payment.

It is very clear that the Court of Appeal was not reversed on the prin-
ciple applicable to the case, but the facts involved in the case itself, and
through the case in all the courts the principle is unassailed.    The Su-
preme Court of Ohio in the Armstrong case, might well have cited the de-
cision of the Court of Appeal as supporting their conclusion, and the de-
cision of the House of Lords does not militate in the slightest against
their decision; but both cases are authority against the sweeping head
notes the court adopted for its decision. Now, how different were the facts
in the Vagliano case from the facts in the case at the bar?  No business
transactions were confided to Glyka's care; no duty devolved upon him to
conduct any negotiations with Vucina; no keeping of accounts; no require-
ments on him to know the state of the account between Vagliano and Vu-
cina; nothing but the prefunctory duty of attending to the firm's foreign
correspondence, and it does not appear that he was authorized to write
any letters, or conduct any correspondence himself.

In the case under consideration, the corporation was acting through
Schrader; his acts in carrying out the steps necessary to the only kind of
transaction it was authorized to engage in were its acts; the one fact on
which only its *bona fide* transaction of business could be predicated
was the fact it intrusted to him to ascertain the genuineness of; it aban-
doned to him its entire functions, and its officers were but the blind instru-
ments of his dishonest will.

The drawing of the check was but the last step in a transaction completed
by that act.   It made no complete transaction severable from the whole.
Without the antecedent steps, the check had no meaning at all, and the
insertion of the name of the payee dated back to the time when Schrader
first bought the money.   It was not the case of a third person coming
in and making an independent fraudulent representation on the strength
of which the drawer innocently draws a check; but it was an act which
tainted the entire transaction from its inception.   It was not a case of
the want of supervision of the acts of an employee which are merely in-
cidental to the carrying on of the drawer's business, but it was the sur-
render to the agent of duties in the very transaction in which the drawer
was engaged, which he not only ought to perform himself, but which he
alone must perform, or become subject to the very thing which Schrader
did.   It was not so much the fraud of the agent which caused the loss,

as the gross negligence of the corporation itself which permitted and, as it were, gave leave to the agent to commit the fraud. The fraud was the representation to the association that Caroline Beckler was a real person; that representation went into the check, and the corporation made that representation to the bank. The loss did not occur because the bank failed to discover that Caroline Beckler was non-existent; but because the plaintiff, through its negligence, permitted the representation to be made that that name represented a real person. The liability of bankers is based on real transactions with their customers. They deal with instruments which are recognized by the law merchant as checks drawn by a real person to the order of a real person. It is not the custom of drawers of checks to deal with fictitious payees; nor do bankers engage to pay such paper. It is true, that where the drawer in good faith, innocenty, and in ignorance, draws a check, through the fraud of a third person, to a fictitious payee, it is the law that the bank and not he shall suffer; but it is not the law that when the check is so drawn through the negligence of the drawer himself in, and in connection with the actual drawing of the check iself, he can still protest his innocence, throw the entire burden upon the bank, and escape all liability. He is the author of his own injury, and he alone should suffer.

The syllabus in the Armstrong case carried to its logical conclusion would require this court to say that no matter how negligent a man may be in drawing his checks, or how much he entrusts his business to his agents, or how little he supervises their acts, that his banker shall still be liable to him tor misrepresentations growing out of his very conduct; and this too, although he never investigates the conduct of his business by those who do it for him; in short, that he owes no duty to his banker to use any care at all, not even ordinary care. Justice cries out against such a conclusion. It ought not be the law, and under such authorities as these on the subject that conclusion need not necessarily be reached. Judge Ranney says in Ellis & Morton v. Ohio Life & Trust Co. *supra*, at page 667; "In the forum of conscience, it is true, that there may be a wide difference between intentional injuries and those arising from negligence. But no man operates quite as absolutely in this world as though he were the only man in it; and the very existence ot society depends upon compelling every one to pay a proper regard to the rights and interests of others. * * * The necessity for care and caution on the part of those who use bills and checks, to prevent injury to those upon whom they are drawn, is strikingly illustrated in another class of cases" and then he cites Young v. Grote as establishing that principle.

That principle, founded on reason and justice, has no application to the facts in the Armstrong case, and so far as it is repudiated by the syllabus in that case, this court may with propriety adopt the principle rather than the syllabus, and be governed accordingly.

The plaintiff places much reliance on the case of Shipman et al. v. Bank of the State of New York, 126 N. Y. 3. Shipman et al. were practicing law in the City of New York. Bedell, a lawyer of experience and in whom they had the utmost confidence, had charge of their real estate department through which annually passed hundreds of thousands of dollars, usually furnished by clients to be loaned, and which was deposited in the firm's general bank account with the defendant. It was Bedell's custom to state to the cashier of the firm the amounts of money needed by him to conduct the business entrusted to him, and to furnish the names of the parties to whom payments were to be made. The cashier prepared the checks in conformity with the information so furnished to him, and took the checks to the member of the firm who had general charge of the

department, and obtained from him the firm's signature thereto.    Bedell
then received the checks, and delivered them to the parties entitled there-
to.    Through this course of business, Bedell in perpetrating a fraud for
his own benefit, obtained checks for large sums of money, payable to
fictitious persons, whose names he indorsed on the checks, and negotiated
them.    The bank paid the checks.    On the discovery of the fraud, the
bank having refused to re-pay to the plaintiffs the amount covered by
the checks, the plaintiffs sued, and finally recovered.    The case is very like
the case at the bar, and would be strong authority for plaintiff, but for one
important fact.    Under the New York practice, the Court of Appeals do
not go into the weight of the evidence.    They regard the findings of the
court below as conclusive on that part of the case, and concern them-
selves only with determining the law applicable to the facts so found.
It was found below that the plaintiffs were not negligent, and the Court
of Appeals contented itself with remarking that they could not say that
there was no evidence to support that finding; but they did not determine
the question whether or not the plaintiffs had been negligent.    This fact
destroys the case as an authority in this case.    How important that fact
is, is illustrated by what the court say of the decision of the House of
Lords in the Vagliano case.    They say: "The view of the case taken in
the opinions delivered in the House of Lords, aside from the construction
of the statute, may very well be attributed to a different shading of the
facts, and to the further consideration which can be inferred from the
. record, that that tribunal is not confined, as we are, to a review of the
courts below upon questions of law only.    For these reasons the Vagliano
case cannot be regarded as authority adverse to the conclusion at which
we have arrived in this."    If the court had gone into the evidence they
would have found a case of negligence differing only in degree of grossness
from the case at bar.

I am of opinion that on principle, authority and justice, the plaintiff
ought not recover.    It is not important whether the case be based on es-
toppel, negligence or the higher ground that the plaintiff ought not to recov-
er for its own wrong; but looking at it in the worst aspect for the bank, the
plaintiff can recover from the bank for paying its check contrary to its
direction, and the bank can recover from the plaintiff for its negligence.
The result to the parties is the same, and circuity of action is avoided by
leaving the parties where we find them, and giving judgment for the de-
fendant.

- In this view of the case it is not necessary to express any opinion on
the other points raised by the defendants, that Schrader was the plaintiff's
agent acting within the scope of his authority, through whose act the bank
was misled, and whose knowledge as agent of the fictitious character of
the payee is in the law imputable to his principal; and that the plaintiff
ratified his act by failing to institute immediate inquiries when the treas-
urer and auditing comittee saw Schrader's name on the checks after they
were returned to the plaintiff.    These points were argued on both sides
with great zeal and skill; the authorities are very numerous, the further
discussion of which would extend this opinion, already too long, almost
indefinitely.

W. A. Davidson, Adolph Brown, Milton Sater, for plaintiff.

John W. Warrington, Charles H. Stephens, for defendant.